NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MARY HELEN WOODSON,<br>Plaintiff,<br>v.<br>INTERNATIONAL BUSINESS MACHINES, INC.,<br>Defendant. | Case Number C 05-3387 JF<br>ORDER[1] DENYING IBM'S MOTION TO DISMISS<br>[re: docket no. 22] |

Defendant International Business Machines, Inc. ("IBM") moves to dismiss the second amended complaint ("SAC") of Plaintiff Mary Helen Woodson ("Woodson") for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court has considered the briefing of the parties and the oral arguments presented at the hearing on April 28, 2006. For the reasons discussed below, the motion will be denied.

## I. BACKGROUND

Woodson filed the complaint in this action in the Santa Clara Superior Court on May 10, 2005, and filed a first amended complaint ("FAC") on July 8, 2005. On the basis of diversity

[1] This disposition is not designated for publication and may not be cited.

jurisdiction, IBM removed the action to this Court on August 19, 2005. On November 8, 2005, this Court granted IBM's motion to dismiss for failure to state a claim upon which relief may be granted. Woodson's claim for religious discrimination was dismissed without leave to amend because Woodson conceded that this claim was time-barred. Woodson's claims for age and disability discrimination were dismissed with leave to amend because Woodson did not allege any facts demonstrating how her transfer to a new position resulted in a substantial adverse change in the terms and conditions of her employment. Woodson's claim for breach of contract was dismissed with leave to amend because Woodson did not allege how her transfer within the company breached any of the employment terms recited in the FAC. Woodson's claim for breach of implied covenant, which asserted that IBM's breach of contract was in bad faith, was dismissed because Woodson failed to allege adequately a breach of contract.

On December 5, 2005, Woodson filed a second amended complaint ("SAC"), in which she alleges the following. Woodson was hired by IBM as an Advisory Software Engineer in November 2000, at which time she had thirteen years of prior employment with IBM. SAC at ¶ 3. She always received positive performance reviews. *Id.* On June 24, 2002, her position was eliminated and she was informed that her employment would be terminated unless she found another position at IBM within thirty days. *Id.* at ¶ 4. At this time, Woodson was 57 years old and was disabled by back problems that had developed after an auto accident. *Id.* at ¶¶ 5-6, 24. Her co-workers and her supervisor were aware of these back problems. *Id.* at ¶ 24.

Woodson's position was the only position eliminated in her department, Department M72. *Id.* at ¶ 9. She was told that the decision to eliminate her position was based upon performance and skills. *Id.* at ¶ 8. However, she alleges that the elimination of her position was merely a pretext, and that IBM in fact was motivated by age and disability discrimination. *Id.* at ¶¶ 39 and 48. Woodson believes that she was the oldest or one of the oldest employees and the only disabled employee of Department M72 when she was terminated. *Id.* at ¶¶ 9-10. She alleges that younger employees and employees without disabilities, with less skill and experience, were retained. *Id.* at ¶ 40.

Before she was terminated, Woodson worked as a member of the DFSORT work group

and as a Level 3 support person for DFSORT. *Id*. at ¶ 15. After she was terminated, she found a new position as a Level 2 support person in Department L55, for DFSORT and MVS Utilities. *Id*. at ¶ 18. Woodson alleges that the transition from a Level 3 position to a Level 2 position constituted a demotion. *Id*. at ¶ 38. Instead of assisting Level 2 support with complicated problems, as she has as Level 3 support, she was working as Level 2 support herself. *Id*. at ¶ 19. She also believes that some of the Level 2 support employees resented her for having worked previously to improve the performance of DFSORT Level 2 support. *Id*. at ¶ 20. Woodson also alleges that "[i]t is quite common for developers and Level 3 support people to look down on Level 2 support people and to regard them as less competent and valuable." *Id*. at ¶ 33.

There are numerous ways in which a Level 2 support position is different from a Level 3 support position. While Level 3 support personnel have a great deal of flexibility in their schedules, Level 2 support personnel are required to be on call during off-shift hours and meet particular response-time criteria (ranging from one to four hours). *Id*. at ¶¶ 21-22. The flexibility that Woodson enjoyed in her previous position allowed her to take advantage of the employee gym, which was helpful in managing her back pain. *Id*. at 23-25. Without flexibility in her schedule as a Level 2 support, Woodson was unable to go to the gym regularly during the workday, and her back pain increased. *Id*. at ¶ 26. The earlier morning work hours required of a Level 2 support also limited Woodson's ability to take a pain medication that caused sedation. *Id*. at 27. Woodson's resultant back pain caused her to lie on the floor at work and affected her work performance. *Id*. at ¶ 28.

Woodson did not get a pay cut in her new position. *Id*. at ¶ 31. She alleges that whenever anyone at IBM begins in a new position, it is required (although there are rare exceptions) that he or she receive a low performance rating (a "3"). *Id*. at ¶ 11. Because Woodson hoped to get a higher performance rating than the usual low rating, she "began working 12-16 hours on many days in order to reduce the backlog and improve her chances of getting a '2'on her first evaluation in the job." *Id*. at ¶ 29. However, Woodson's first performance review was "the obligatory '3,'" which prevented her from getting the salary increase that she likely would have received in her previous position and put her at risk in case of a layoff. *Id*. at ¶¶ 30-32.

Woodson alleges generally that "she has sustained and continues to sustain substantial losses in earnings and other employment benefits," and that "she has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish." *Id*. at ¶¶ 42-43.

Woodson further alleges that there was an express and implied-in-fact employment contract between herself and IBM, which included the following terms and conditions:

> Plaintiff would be able to continue her employment with Defendant indefinitely as long as she carried out her duties in a proper and competent manner;
>
> Plaintiff would not be demoted, discharged, or otherwise disciplined, nor would Plaintiff's job functions be reassigned for other than good cause with notice thereof.

*Id*. at ¶ 56. She alleges that this contract was evidenced by: (a) IBM's written personnel policies and discipline procedures, (b) "[t]he existence of an established policy within [IBM], which was known to and relied on by Plaintiff," and (c) oral and written representations by her superiors that Woodson was doing a satisfactory job. *Id*. at ¶ 57. Woodson relied on these representations and thought that her employment was secure. *Id*.

Finally, Woodson alleges that her employment agreement with IBM contained an implied covenant of good faith and fair dealing, which "required Defendants to fairly, honestly, and reasonably perform the terms and conditions of the employment agreement." *Id*. at ¶ 63. Woodson was in an unequal bargaining position with IBM, and, because her employment was the basis of her entire livelihood, was vulnerable to IBM. *Id*. at ¶ 64. Woodson alleges that IBM breached the implied covenant by, among other things, terminating her in bad faith, knowingly terminating her without just cause, applying different standards to her than to other employees, not following written personnel policies, and not placing her in available alternative positions. *Id*. at ¶ 65.

Based upon these allegations, Woodson asserts the following claims: (1) age discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940 *et seq.*; (2) disability discrimination in violation of FEHA; (3) breach of employment contract; and (4) breach of the implied covenant of good faith and fair dealing.

## II. LEGAL STANDARD

"A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984). For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). The pleading of a *pro se* litigant is held to a less stringent standard than a pleading drafted by an attorney, and is to be afforded the benefit of any doubt. *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Karim-Panahi v. Los Angeles Police Department*, 839 F.2d 621, 623 (9th Cir. 1988). Further, a *pro se* litigant must be given leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).

## III. DISCUSSION

### a. Claims 1 and 2: Age and disability discrimination

With respect to the claims for age discrimination and disability discrimination, IBM argues that Woodson has failed to allege facts demonstrating that she suffered an adverse employment action. Woodson argues that it is not necessary that she allege an adverse employment action in order to establish a prima facie case of discrimination under FEHA. However, IBM correctly argues that:

> To establish a prima facie claim for violation of the California Fair Employment and Housing Act (FEHA), plaintiff must introduce evidence demonstrating that he: (1) has a disability, (2) is otherwise qualified for employment, and (3) has suffered an adverse employment action because of the disability.

*Swonke v. Sprint Inc*., 327 F.Supp.2d 1128, 1133 (N.D. Cal. 2004) (citing *Brundage v. Hahn*, 57 Cal.App.4th 228, 236 (1997)). The issue presently before the Court is whether Woodson's additional allegations—including, for example, that her work hours became less flexible, that she lost an opportunity for a pay raise, that the conditions of her work led to increased pain—are sufficient to establish that Woodson's intra-company transfer constituted an adverse employment

action.[2]

While the definition of adverse employment action is not limited to "ultimate" decisions regarding hiring, firing, demoting or failing to promote, an employment action is actionable only if it results in "a substantial adverse change in the terms and conditions" of employment. *Akers v. County of San Diego*, 95 Cal.App.4th 1441, 1455 (2002); *see also Horsford v. Board of Trustees of California State Univ.*, 132 Cal.App.4th 359, 373 (2005). "A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient." *Akers*, 95 Cal.App.4th at 1455.

In *Yanowitz v. L'Oreal USA, Inc.*, in which the California Supreme Court concluded that the standard under FEHA for adverse employment actions is the same for retaliatory actions as for discriminatory actions, the court held:

> Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [FEHA].

*Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1050, 1054 (2005). An employer's actions need not constitute "one swift blow," but rather may consist of "a series of subtle, yet damaging, injuries." *Id.* at 1056. The *Yanowitz* court concluded that the actions directed at Yanowitz constituted adverse employment action: "Months of unwarranted and public criticism of a previously honored employee, an implied threat of termination, contacts with subordinates that only could have the effect of undermining a manager's effectiveness, and new regulation of the manner in which the manager oversaw her territory did more than inconvenience Yanowitz. Such actions, which for purposes of this discussion we must assume were unjustified and were meant to punish Yanowitz for her failure to carry out her supervisor's order, placed her career in

---

[2] Woodson also argues that IBM has not met its burden under the *McDonnell-Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). However, under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

jeopardy." *Id*. at 1060.

A reduction in an employee's potential for career advancement may constitute an adverse employment action. *Akers*, 95 Cal.App.4th at 1456 ("Where an employer reacts to a discrimination complaint by eliminating a reasonable potential for promotion or materially delaying the promotion, there is a legally tenable basis for a jury to find the employer substantially and materially adversely affected the terms and conditions of the plaintiff's employment.") (citing *Boone v. Goldin*, 178 F.3d 253, 255-57 (4th Cir.1999)). In *Akers*, a deputy district attorney received "a negative performance review and counseling memorandum—accusing her of 'incompetence,' 'dishonesty' and 'insubordination.'" *Id*. It was "undisputed that 'an accusation of dishonesty' against a prosecutor 'can be a career ender' and that a deputy district attorney's reputation for honesty is an essential quality of a successful prosecutor." *Id*. While, "[a]ll agreed [that the plaintiff] was a fine trial attorney capable of handling difficult and sensitive cases," her supervisor told her that "she would never again work in the domestic violence arena—an area in which she excelled—and top management refused to transfer her to the elder abuse unit." *Id*. The plaintiff's next promotion level "was highly competitive and largely controlled by the 'subjective evaluations' of superiors," and "there was evidence showing [she] left the district attorney's office because of the adverse actions taken against her and the severe damage to her reputation within the office." *Id*.

In *Boone*, the Fourth Circuit held that, "based on our certainty that Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment," "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect on her." *Boone*, 178 F.3d at 256.[3] While "a change in working conditions may be a factor to consider in assessing whether a reassignment qualifies as an adverse employment action that could give rise to Title VII liability," an assertion that the new position involved work that "was unfamiliar and more stressful" did not rise to the

[3] Because of the similarity between FEHA and Title VII of the federal Civil Rights Act, California courts "often look to federal decisions interpreting [this statute] for assistance in interpreting the FEHA." *Reno v. Baird*, 18 Cal.4th 640, 647 (1998).

level of constituting an adverse employment action. *Id.*

In a case involving three members of a police department, the California Court of Appeal found that various modifications of employment constituted adverse employment actions. When the first member of the department, a police lieutenant, was "removed from his former position near the top of the department's chain of command" and then "removed entirely from law enforcement duties, the objective terms and conditions of employment [had] been adversely affected." *Horsford*, 132 Cal.App.4th at 374. Also, "[w]hen that same veteran police administrator is transferred to head a department in which he has no training or expertise (and in which position he was inferably expected to fail), the terms and conditions of employment have been adversely changed." *Id.* Similarly, the second member of the department's "suspension from duty for lying on a police report"—which "can destroy a police officer's career" —constituted adverse employment action. *Id.* (specifying that this holding applied "in the particular factual context of employment as a peace officer"). Additionally, with respect to the second member of the police department, "reduction in authority and negative performance reviews also constitute adverse employment action." *Id.* The third member of the police department was "removed from a highly desirable position as the investigative officer for the department and was placed on administrative leave for a period of months as a result of [the police chief's] claim that [he] was mentally unstable." *Id.* This, too, was held to constitute adverse employment action. *Id.*

In *Patten v. Grant Joint Union High School Dist.*, 134 Cal.App.4th 1378, 1381-83 (2005), a school principal sued a school district for retaliation after being transferred from a large, underperforming middle school, to a smaller middle school with higher achieving students. The school district claimed the transfer did not constitute an adverse employment action because plaintiff was still a principal, her wages, benefits and duties remained the same, and the transfer allowed her to use her skills in curriculum development. *Id.* at 1389. The court found that the transfer constituted a material adverse employment action because plaintiff was a young principal, with her entire career ahead of her, and the smaller, high achieving school presented her with less of an opportunity to distinguish herself. *Id.*

Construing the allegations in the light most favorable to Woodson, and considering that Woodson is proceeding *pro se*, the Court concludes that Woodson's allegations are just enough to state a claim that she was subjected to an adverse employment action. While it is possible that Woodson may not be able to support her allegation with sufficient factual evidence, that is a question to be decided on summary judgment. Accordingly, the Court will not dismiss Woodson's claims for age and disability discrimination.

**b. Claims 3 and 4: Breach of contract & Breach of the implied covenant of good faith and fair dealing**

Woodson's claim for breach of contract alleges that IBM violated the alleged contractual obligation that "Plaintiff would not be demoted, discharged, or otherwise disciplined, nor would Plaintiff's job functions be reassigned for other than good cause with notice thereof." SAC at ¶ 56. Woodson alleges that the transition from a Level 3 position to a Level 2 position constituted a demotion. *Id.* at ¶ 38. Again construing the allegations in the light most favorable to Woodson, and considering that Woodson is proceeding *pro se*, the Court concludes that Woodson's allegations are just enough to state a claim for breach of contract. IBM's contention that Woodson was an at-will employee may be revisited on summary judgment. Accordingly, the Court will not dismiss Woodson's claim for breach of contract.

Finally, Woodson alleges that her employment agreement with IBM contained an implied covenant of good faith and fair dealing, which "required Defendants to fairly, honestly, and reasonably perform the terms and conditions of the employment agreement." *Id*. at ¶ 63. Under California law, every contract contains an implied covenant of good faith and fair dealing. *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 400 (2000). This implied covenant requires that neither party do anything that will deprive the other of the benefits of the contract. *Id*. Woodson alleges that IBM breached the implied covenant by terminating her from her position as Level 2 support in bad faith and for arbitrary and unfair reasons. Having concluded that Woodson has stated a claim for breach of contract, the Court will not dismiss Woodson's claim for breach of the implied covenant of good faith and fair dealing.

**IV. ORDER**

Good cause therefore appearing, IT IS HEREBY ORDERED that the motion to dismiss is DENIED. Defendants shall file their answer within twenty (20) days of the date of this Order.

DATED: May 2, 2006

JEREMY FOGEL
United States District Judge

This Order was served on the following persons:

Plaintiff *pro se*:

Mary Helen Woodson
475 Milan Drive, #102
San Jose, CA 95134

Counsel for Defendant IBM:

Patrick C. Doolittle & Scott G. Lawson
Quinn Emanuel Urquhart Oliver & Hedges, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111